APPEALS COURT 
 
 JAMES BARROS & another[1] vs. SELECT BOARD OF NANTUCKET & others.[2]

 
 Docket:
 23-P-1058
 
 
 Dates:
 April 1, 2024 – August 19, 2025
 
 
 Present:
 Henry, Hershfang, & Smyth, JJ.
 
 
 County:
 Nantucket
 

 
 Keywords:
 Constitutional Law, Freedom of speech and press. Massachusetts Civil Rights Act. Civil Rights, Coercion. Practice, Civil, Summary judgment.
 
 

       Civil action commenced in the Superior Court Department on January 26, 2021. 
      The case was heard by Mark C. Gildea, J., on a motion for summary judgment, and a motion for reconsideration was considered by him.
      David Hadas for the plaintiffs.
      Deborah I. Ecker for the defendants.
      HERSHFANG, J.  The plaintiffs brought this action after a contentious meeting of the select board of Nantucket (board) held on the two-year anniversary of an unsolved hate crime at the historic African Meeting House.  The plaintiffs, James Barros and Rose Marie Samuels, are long-time residents of the town of Nantucket (town or Nantucket) and members of its Black community.  In count one of their third amended complaint, the plaintiffs sought a declaration that during a board meeting held on March 11, 2020, the town manager, Elizabeth Gibson, who is white, and Nantucket police Chief William Pittman, who is also white (collectively, the defendants), abridged their rights to free speech secured under art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Constitution.  In count two, the plaintiffs alleged violations of the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H & 11I, and sought damages and attorney's fees.[3]  At the conclusion of discovery the defendants moved for summary judgment on both counts; the plaintiffs opposed the motion.
      Following a hearing, a Superior Court judge allowed the defendants' motion; he later denied the plaintiffs' motion for reconsideration or in the alternative for relief from judgment.  We vacate the portions of the judgment and the order denying the motion for reconsideration related to Samuels's MCRA claim against Gibson.  The judgment and the order are otherwise affirmed. 
      Background.  We take the facts from the summary judgment record, viewed in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor.  See Kennie v. Natural Resource Dep't of Dennis, 451 Mass. 754, 755 (2008).  "When there is a dispute of fact, we must accept [the plaintiffs'] version for purposes of summary judgment."  Gallagher v. South Shore Hosp., Inc., 101 Mass. App. Ct. 807, 810 n.6 (2022).
      1.  Unsolved crimes.  a.  Hate crime.  In March 2018, the African Meeting House, a national historic landmark and an important civic symbol for Nantucket's Black community, was defaced with the spray-painted words, "NIGGER LeAVe!"[4]  See Appendix.  The next day, Dylan Ponce confessed to Jeffrey Sayle, the brother-in-law of the town manager, Gibson, that "he had either hit the [n-word] church or he had tagged the [n-word] church."[5]  The following week Sayle retrieved and hid the spray paint can used by Ponce.  Although Ponce told Sayle that he acted alone, rumors circulated around town that Sayles's son and Gibson's son were also involved in the hate crime.  The unsolved hate crime threatened and intimidated the plaintiffs and caused them to fear for their and their families' safety and to question their safety in public places in the town. 
      b.  Hit and run.  In August 2018, Samuels's twelve year old son was hit by a car in a crosswalk behind his school in broad daylight, thrown from his bicycle onto the hood of the vehicle, and fell to the ground.  He suffered internal injuries.  The driver stuck her head out of the window and said, "is he ok" before driving off.  None of the witnesses to this hit and run called the police; Samuels learned about it from a social media post on Facebook.  At the hospital, a police officer met with Samuels and promised to keep in touch.  Despite Samuels's numerous phone calls and visits to the police department, no officer followed up with her.  This left her feeling "so broken . . . because I could have lost my son."  
      2.  Hate crime investigation.  At the board's meeting in October 2018, seven months after the hate crime was committed, a Nantucket police detective gave an update on the department's investigation.  He stated that the police had exhausted all leads.  The following month, that same detective visited Barros's business to talk about the investigation and mentioned "[n-words] talking shit" and "brothers or sisters talking shit." 
      In June 2019, fifteen months after the hate crime was committed, Sayle disclosed Ponce's involvement to Deputy Police Chief Charles Gibson, the husband of town manager Elizabeth Gibson.[6]   Within two days, Pittman turned the investigation over to the district attorney's office and the State police.  At the next board meeting on June 19, 2019, Pittman informed the board and the public of his decision.  More than one year later, Sayle called the State police and gave them the spray paint can.  He was indicted and pleaded guilty to misleading an investigation.
      3.  March 4 board meeting.  By March 4, 2020, the State police had not made an arrest for the hate crime.  At the board meeting that day, which was video recorded, Samuels asked the town manager, Gibson, whether there was an update about the hate crime investigation.  Gibson was not a member of the board but often attended meetings.  At this meeting, she sat at the front of the room with the board members.[7]  Gibson replied, "My understanding . . . is that the entire matter was referred to the State police," who, when asked for an update four weeks earlier, had "reported there was not anything to update." 
      Samuels stated that she understood "the matter is about to be resolved."  Gibson responded, "I don't know what that would be about."  Samuels continued, "So after all this time nobody knows who did, who wrote on the building."  Gibson replied, "Apparently not."
      The board chair then asked Pittman for an update from the State police.  Pittman went to a microphone and explained that given what he called an "implication" that members of the police department or influential town officials were involved in the hate crime, the State police would not reveal any information to him and, when he had asked, he was told it was better if the local police were not involved.
      4.  Subject board meeting.  At the board meeting one week later on March 11, 2020, Samuels walked to the microphone closest to Gibson and said she had questions for Pittman, but first there was "something [she needed] to say."  Samuels described the hit and run accident involving her son and the lack of police response.  She recounted trying to investigate that crime herself by obtaining video footage from cameras around town but being told it could be given only to the police; one school employee whom Samuels asked about video recordings stated that it was not the school's responsibility.
      Samuels expressed her belief, shared by others, that race was the reason for the police department's failures to call her or to investigate the hit and run.  Asserting that Pittman would be upset with her for speaking "the truth," Samuels stated that the police "take sides" and do not look out for Nantucket's Black population or for "people from different countries in this community."  Samuels stated that "Nantucket has changed from what it has been," and "become a diverse community," that "justice is supposed to be for every single one in this community."  
      Then Samuels held up a hand-made sign noting the two-year anniversary of the hate crime, and she said that nothing was happening with that investigation.  Samuels recalled her question to Gibson at the March 4 board meeting, then shook her finger at Gibson saying, "I am going to be honest, you did not answer me truthfully."  Samuels then turned toward Pittman in the audience, shook her finger at him, and made the same statement.  Pittman did not respond.  
      Gibson interjected, "Excuse me, Madam Chair, no, this is not the forum for this."[8]  Raising her voice over Samuels's, she continued, "Don't you dare say I did not speak truthfully madam."  Samuels continued to speak, stating, "I am going to speak the truth," with Gibson saying loudly, "And don't you dare say I did not speak truthfully, madam." 
      As Samuels tried to speak, Gibson turned toward the chair of the board, who said, "Rose Marie -- Rose Marie -- I've got -- we've gotta end this."[9]  Samuels responded, "No, I am going to speak," and she did.  Samuels and Gibson then spoke at the same time, with Gibson looking at the chair and saying loudly, "No, you are not going to speak," while Samuels said that local students knew who committed the hate crime.  Gibson continued, saying that Samuels's speech was "against the regulations of the board's agenda policy."  After a momentary pause, Samuels said, "Shame on you people. . . .  You are no better than the parents who paid to get their [kids] into college."[10]  
      Samuels then backed away from the microphone and returned to her seat while the chair said that Samuels was making serious allegations.  Samuels felt belittled.  From her seat, she said, "I can speak whatever I want to speak because my kid is still suffering. . . .  My kid cannot sleep at night.  I cannot get a good night's rest because I have to be there for my kid."  After a moment, Gibson said into her microphone: 
"Madam chairman, I would like to go on record to publicly state I completely am dismayed and angry that someone would stand up at this meeting and say that I was untruthful about something.  You can come to the board at a later time if you have a charge to bring forward, but there is absolutely nothing I was untruthful about last week."
      
When Samuels called out from the audience, "Members of the community know who did it," Gibson turned toward her and replied, "Then why don't they go to the police and tell them?"  As Samuels continued to say that one of the students told the school who did it, Gibson said, "Why [don't] the police know that?"  
      Gibson spoke briefly with the board member to her right and then got up and walked out of the meeting.  As required by the summary judgment standard, we draw all inferences in Samuels's favor, including crediting her testimony that, as Gibson left, she came within a few feet of Samuels "in a physically threatening manner, while [Samuels] was sitting and trying to speak" and "glared down" at Samuels.  Gibson then pointed her finger at Samuels and twice asked whether Samuels was calling her a liar.  Samuels "was so upset the way [Gibson] spoke to [her] before" that she said, "Yes."  Gibson then left the room, audibly slamming the door on her way out.
      After Gibson left, Samuels continued to speak from her seat.  The chair said, "Rose Marie, if you are going to keep talking, you have to come to the mic, but I think that we should probably end this conversation for tonight."  Samuels returned to the microphone.  First, alluding to a statement by Pittman at the prior week's meeting, she asked for the name of the person Pittman had mentioned who was not cooperating with the investigation.  The chair responded, "I don't believe he can disclose details of an ongoing investigation."  Second, Samuels asked for the names of the local police officers who had been accused of covering up for their child.  There was no audible answer before Samuels looked at the chair and said, "He cannot answer that either?"  
      Pittman responded from the audience, "I will answer those questions."  As at other meetings, Pittman wore a dark vest with a Nantucket police emblem on it and had a police lanyard around his neck.  Barros could see a firearm on Pittman's right side.  Pittman said:
"I think this is an improper forum for this.  I think this is really an improper inquisition.  I said but quite honestly, the individual that has made allegations, without naming names, is sitting right there in the room [pointing toward Barros in the audience], and you guys have entertained his speeches two or three times before you.  He implies that police officers or family members of police officers or somebody have been involved in this, yet he has refused to come forward and talk to the police, either us or the State police or the [district attorney]'s office I imagine, I don't know that one for sure, to give us the information he knows.  If he knows something, we can't do anything about it unless he tells what it is.  Now we understand if he thinks we did it, why he wouldn't want to tell us; that's why the case was turned over to the State police, so that they can do the investigation. . . .  We've heard rumors that, I mean you said [looking and motioning toward Samuels], kids have said they know who did it.  We've talked to kids.  We've talked to every kid we can come up with, name wise.  Nobody can tell us who did it.  If, if [pause] -- we can't guess this stuff.  If you've got a name, tell us.  And we will investigate that or we will pass it on at this point to the State police.  But right now, nobody has told us a name.  They just say everybody knows.  Well, everybody but us knows that.  Everybody but the people in this room except for Mr. Barros apparently knows because he has said several times that he knows."
Samuels interrupted Pittman to say, "Not Mr. Barros, sorry, not Mr. Barros, because on Tuesday, I was coming out of the grocery store, and this landscaper stopped me, and he named three names."  Pittman replied, "Well, then they need to call us and tell us."  As Samuels started to list the names, the chair interrupted, "Please don't say the names."  Samuels said, "Okay."  The chair continued, "But please report it to the State police.  It is in their hands.  And everybody wants justice on this subject."  Samuels responded that after what happened with her son, she no longer trusted the Nantucket police.  Then she returned to her seat.  In total, Samuels spoke for more than ten minutes.
      Barros went to the microphone and said he could "not sit here and listen to the chief of police tell a lie."  Barros then recounted that his attorney had written a letter to the police department stating that Barros was willing to cooperate and to reveal what he knew, but that because he did not trust the police department, Barros wanted to talk with the police somewhere he felt safe, like his home or his attorney's office.  In response, Pittman said, "They don't do business like that."  
      Barros then recounted that two weeks earlier, the detective formerly in charge of the hate crime investigation had informed Barros that "this is going to be resolved, we know who it is."  Barros then accused Pittman "[of telling] a big old lie."  At that moment the chair interjected, addressing Barros:  "Jim, remember, this investigation is no longer with this police department.  It has been turned over . . . to the State police."  Barros finished speaking, announced that "my group is not going away," then thanked the board and returned to his seat in the audience.  The chair asked for additional public comments, and no one in the audience responded.  
      Ultimately, in October 2020, a grand jury declined to indict an unnamed individual for the hate crime.  Ponce, who is white, was never charged with the hate crime.  The grand jury indicted Sayle, and he pleaded guilty to misleading an investigation.
      Discussion.  1.  Standard of review.  We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, "all material facts have been established and the moving party is entitled to judgment as a matter of law" (citation omitted).  Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018).  When the opposing party bears the burden of proof, a party "is entitled to summary judgment if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).  See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  "A nonmoving party's failure to establish an essential element of her claim 'renders all other facts immaterial' and mandates summary judgment in favor of the moving party."  Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012), quoting Kourouvacilis, supra at 711.
      2.  Article 16.  Article 16 guarantees that "[t]he right of free speech shall not be abridged," and is at least as protective as the First Amendment.  See Shak v. Shak, 484 Mass. 658, 661 (2020).  We are guided by Barron v. Kolenda, 491 Mass. 408 (2023), which addressed a citizen's free speech rights at a meeting of a town board of selectmen.  
      The defendants appropriately concede that the plaintiffs' public comments at the March 11 board meeting were protected political speech.  See Barron, 491 Mass. at 420-421.  See also Van Liew v. Stansfield, 474 Mass. 31, 38-39 (2016) (public remarks calling planning board member "corrupt and a liar" constituted political speech and represented core of speech protected by First Amendment).  
      The heart of the plaintiffs' constitutional claims is that the defendants' behavior "worked to diminish the power of [their] speech."  Barros asserts that Pittman infringed Barros's rights by "calling [him] out" as a person who could not be trusted before Barros even spoke.  Barros maintains that "his ability to articulate his concerns was negatively impacted by the fact that he had just been publicly ridiculed and embarrassed by the Police Chief."  Samuels focuses primarily on Gibson's frequent interruptions and attempts to silence her and on the "chaotic" effect of Gibson's departure from the meeting.
      Before turning to each plaintiff's claim, we note that art. 16 affords citizens the right to political speech that is "uninhibited, robust, and wide-open."  Barron, 491 Mass. at 421, quoting Van Liew, 474 Mass. at 39.  As the Supreme Judicial Court recognized in Barron, free speech rights arose in a time when political discourse included "much that was rude and personal."  Id. at 418.  These rights and protections are not limited to members of the public but extend to government officials as well.  See Bond v. Floyd, 385 U.S. 116, 135-137 (1966) (holding legislators have same First Amendment protection as citizen-critics).[11]
      a.  Barros's claim.  Pittman's statements (directed at Samuels's comments) about the "improper forum" and "improper inquisition" did not constitute an "abridgment" of Barros's free speech rights.  
      The summary judgment standard requires that we take as true that Barros was frightened when Pittman, the police chief -- who was carrying a holstered service weapon -- pointed a hand at him.  But Barros has alleged no way in which this fear inhibited or interfered with his speech at the meeting.  There is no allegation that Barros was prevented from saying anything he intended to say.  Pittman's statements were initially directed at Samuels, and he questioned whether the meeting was an appropriate forum for her questions.  He then identified Barros as a potential source of information.  Neither effort infringed on Barros's ability to speak.  Article 16 protects a speaker only from those behaviors that abridge the right of free speech and not from expressions of disapproval.  Compare Barron, 491 Mass. at 423 (plaintiff's art. 16 rights violated where board chair suspended public comment session after being compared to Hitler and then ended meeting); Walker v. Georgetown Hous. Auth., 424 Mass. 671, 676 (1997) (public housing authority's policy prohibiting political campaigning and solicitation on authority's property abridged tenants' right to receive communications and violated First Amendment and art. 16); Reproductive Rights Network v. President of the Univ. of Mass., 45 Mass. App. Ct. 495, 506-507 (1998) (university's locking building and posting uniformed officers outside violated free speech rights of plaintiffs who had planned to hold meeting inside).
      b.  Samuels's claim.  Although Samuels experienced more interruptions than Barros, we reach the same conclusion about her art. 16 claim.  Samuels failed to allege facts from which a reasonable jury could conclude that Gibson's conduct abridged Samuels's free speech rights.  After Gibson left the meeting, Samuels directed her questions to Pittman; she spoke for much of the public comment period, and -- other than being instructed not to "name names" -- there is no indication that she had additional questions or comments that she did not voice.  Compare, e.g., Barron, 491 Mass. 423; Walker, 424 Mass. at 676; Reproductive Rights Network, 45 Mass. App. Ct. at 505.  
      3.  MCRA claims.  To establish a claim under the MCRA, the plaintiffs must prove "that (1) [their] exercise [or] enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion."  Roman, 461 Mass. at 711, quoting Kennie, 451 Mass. at 759.  The MCRA "like other civil rights statutes, is remedial.  As such, it is entitled to liberal construction of its terms."  Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985), citing 3 C. Sands, Sutherland Statutory Construction § 72.05, at 392 (4th ed. 1974).  
      In determining whether conduct constitutes threats, intimidation, or coercion, we apply an objective or "reasonable person" standard.  See Glovsky v. Roche Bros. Supermkts., Inc., 469 Mass. 752, 763 (2014).  
      As used in the MCRA, a "threat" "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm."  Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994) (Planned Parenthood).  "'Intimidation' involves putting [another] in fear for the purpose of compelling or deterring conduct."  Id.  "[C]oercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done" (citation omitted).  Glovsky, 469 Mass. at 763.  See Brunelle v. Lynn Pub. Schs., 433 Mass. 179, 183 (2001).  "Not every intemperate exclamation rises to the level of 'threats, intimidation or coercion.'"  Kennie, 451 Mass. at 765, citing Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 762 (2002) (Rapoza, J., dissenting).
      The plaintiffs met the first element of an MCRA claim, as the free speech right they sought to exercise was secured by both the United States and Massachusetts Constitutions.  We ask, then, whether, viewed in the light most favorable to the plaintiffs, the evidence failed to establish that their exercise of protected rights had been "interfered with, or attempted to be interfered with" by the defendants through threats, intimidation, or coercion (citation omitted).[12]  Kennie, 451 Mass. at 759.  
      a.  Samuels's MCRA claim.  Samuels's speech at the March 11 meeting was interrupted many times.  The video recordings reflect that Samuels was talked over, told (1) "to end this," (2) that she was "not going to speak," and (3) that her speech was "against the regulations of the board."  Samuels "felt [she] was being coerced . . . to stop speaking," causing her to back away from the microphone and speak from her chair in the audience.  Samuels maintains that Gibson "stormed" past her when leaving the meeting, "in a physically threatening manner," "glar[ed] down" at Samuels from "within a few feet," and stopped to ask, twice, whether Samuels was calling her a liar.  Samuels characterized Gibson's voice as "loud and threatening," and Samuels was frightened by this encounter.  
      In assessing the second prong of the MCRA, we are to apply an objective standard, but we need not ignore who the plaintiff is.  In a case involving access to abortion rights, the Supreme Judicial Court articulated the question as whether a "reasonable woman seeking abortion services would be threatened, intimidated, or coerced by the defendants' conduct."  Planned Parenthood, 417 Mass. at 474-475.  "[T]he threat is to be tested objectively," id. at 475, but "objectivity" does not foreclose consideration of the plaintiff's situation.  See id. at 474-475.  See also id. at 475-476 (physical confrontations, even without violence, "highly likely to instill fear and concern for personal safety in a reasonable person seeking abortion services").  Viewing the record in the light most favorable to Samuels, as we do on summary judgment, she had experienced, and continued to experience, racism from the Nantucket police.  She mistrusted Gibson, the town manager, who was married to the deputy police chief.
      Viewed in this light, the record is sufficient to create a material dispute of fact over whether Gibson attempted to interfere with Samuels's free speech rights.  Gibson repeatedly spoke over Samuels, told Samuels she was "not going to speak," approached Samuels in a manner that Samuels described as "physically threatening," and twice asked, as she stood over Samuels, "Are you calling me a liar?"
      We next consider whether, again viewed in the light most favorable to Samuels, the evidence establishes as a matter of law that Samuels "has no reasonable expectation of proving" that any attempted interference involved threats, intimidation, or coercion.  See Kourouvacilis, 410 Mass. at 716.  This is a close question.  In Barron, the most factually similar case, the defendant "told the plaintiff to stop speaking" and "started screaming at her, and threatened to have her removed from the meeting."  Barron, 491 Mass. at 424.  The defendant then called a recess of the meeting.  Id. at 413.  The plaintiff left, and the meeting was never reconvened.  Id.  The court ruled that, if proved at trial, the plaintiff "could establish a violation of the MCRA."  Id. at 424.  So too here; Gibson's response to Samuels's comments, including Gibson's physically threatening departure from the meeting and hostile, intimate back-and-forth with Samuels, could be sufficient to establish a violation of the MCRA at trial.[13]
      b.  Barros's MCRA claim.  Viewing the record in the light most favorable to Barros, he was impugned by Pittman, suffered embarrassment, and felt intimidated by Pittman's being armed.[14]  Barros alleged that Pittman violated his article 16 rights by "silencing" him.  But Barros heard Pittman's comments and then spoke.  This fact pattern has no analogue in the cases finding art. 16 violations.  Compare, e.g., Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 99-100 (1987) (threat of disruption of performance because of performer's expressed political views motivated cancellation of contract); Bell v. Mazza, 394 Mass. 176, 180 (1985) (defendants interfered with plaintiffs' contractor, tried to get electric service cut, called police and fire departments, blocked plaintiffs' passage, threatened to "do anything" "at any cost," and told plaintiffs they had formed an association to keep plaintiffs from exercising their rights).  Because Barros's MCRA claim founders at this first element, summary judgment was properly granted.
      Conclusion.  We vacate so much of the judgment and the order denying the motion for reconsideration as relate to Samuels's MCRA claim against Gibson and remand for further proceedings on that claim.  The judgment and the order for reconsideration are otherwise affirmed.  
                                          
 
So ordered. 
 
      SMYTH, J. (dissenting).  On March 11, 2020, Nantucket residents Rose Marie Samuels and James Barros attended a select board (board) meeting, as they had done numerous times since someone defaced the African Meeting House with the words "NIGGER LeAVe."[1]  Dissatisfied with the Nantucket police investigation of this crime, Samuels sought answers from town officials, including town manager Elizabeth Gibson, who supervised the police.  On this date, Samuels had prepared a list of grievances to present to the board, town manager, and police chief, including her concern that the Nantucket police did not provide the same level of protection to Black residents as to the Island's white residents.  Yet, when Samuels attempted to fully convey her grievances, Gibson and Police Chief William Pittman, leaders of the all-white Nantucket power elite,[2] attempted to suppress the content of Samuels's speech by repeatedly interrupting her, ordering her to stop talking because of the content of her speech, treating her differently from white speakers, and accusing her of conducting an "improper inquisition" at an "improper forum."  
      Considering the record in the light most favorable to the plaintiffs, a rational jury could conclude that the defendants, motivated by self-preservation and their attempts to conceal the identities of the suspected perpetrators of the desecration of the African Meeting House, effectively deterred Samuels, and would have likewise deterred a person of reasonable fortitude, from freely exercising the right to speak on public issues as guaranteed by arts. 16 and 19 of the Massachusetts Declaration of Rights.[3]
      A rational jury could also conclude that Pittman sufficiently deterred Barros from exercising his rights under arts. 16 and 19, and the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H & 11I, by publicly accusing Barros of acting as a noncooperative troublemaker who was spreading baseless rumors that divided the Island.  Whether Pittman attempted to coerce, or did in fact inhibit Barros from exercising his rights under arts. 16 and 19, are questions for a trier of fact.
      This dissent stems from two fundamental points of disagreement with the court's decision.  First, we disagree on whether a rational jury could find that the defendants' conduct, as reasonably perceived by the plaintiffs, sufficiently inhibited the plaintiffs' rights so as to constitute abridgment under art. 16, and, for Barros, a violation of the MCRA.  Second, we differ as to the extent the power dynamic that existed between the defendants and the plaintiffs due to their respective status on the Island magnified the defendants' attempts to suppress the plaintiffs' speech because of its content, and contributed to the plaintiffs' inability to freely speak to a public issue at the March 11, 2020 board meeting.
      I would vacate those portions of the judgment related to Samuels's claims in their entirety, and vacate the judgment as it relates to Barros's claims against Pittman, and remand the matter for trial.[4]
      Background:  The parties.  While I appreciate the court's detailed background section, additional background facts are necessary to account for the disproportionate authority and influence that the defendants enjoyed over the plaintiffs.  The defendants' respective positions of authority are relevant to whether the defendants' words and conduct inhibited the plaintiffs' right to speak freely under arts. 16 and 19 and the MCRA.[5]  See National Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024) (Vullo) ("The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive").  
      Gibson first began working for the town of Nantucket in 1988, when she was twenty-two years old.  She has held the position of town manager since 1995.[6]  As town manager, Gibson is a remarkably powerful and influential individual.  She exercises direct supervision over almost every town department, including the police, fire, building, finance, health, marine and coastal resources, public works, board of appeals, conservation commission, planning board, council on aging, counsel for human services, historic district commission, parks and recreation, and the shellfish and harbor advisory board.  As town manager, Gibson maintains appointment and disciplinary (including discharge) powers over the department chiefs and their employees.  Gibson is also in charge of negotiating town contracts, including employment contracts.  In addition, Gibson's duties included preparing and submitting all of the town's "annual operating budgets and capital budgets."  As town manager, Gibson is not subject to general election, but instead is subject to reappointment by the board; Gibson had been reappointed for consecutive terms since 1995.
      Gibson's considerable authority and influence would likely be relevant factors to a jury's assessment of the import of her words and conduct directed at the plaintiffs at the March 11, 2020 meeting.  See Vullo, 602 U.S. at 191–192.  As an acknowledgment of Gibson's influence, multiple town residents warned Barros that he might face adverse consequences to challenging Gibson by implicating her relatives as being involved in the African Meeting House crime.  These individuals cautioned Barros, "You know, it's [Gibson's] son and nephew; so, be careful.  Watch your back."  
      Pittman was appointed chief of police in 2004.  In June 2019, he told Gibson that her "family members" were involved in the defacement of the African Meeting House.  Pittman explained at the board meeting on March 4, 2020, that the investigation had been turned over to the district attorney's office and the State police because of the "implication that either members of this department or . . . influential people in this town may have been involved in the incident."[7]  The record demonstrates that the "influential people" suspected of being involved in the defacement of the African Meeting House included, and may have been limited to, Gibson's family members.[8]  
      The record demonstrates that the plaintiffs inhabited a different stratum in the town altogether, as they maintained no apparent political, economic, social, public order, or law enforcement influence over town affairs.[9]  Samuels, of Jamaican descent, became a full-time resident of Nantucket in 1999; she resides on Nantucket with her son.  Samuels has worked in the home healthcare field when her health permits.  
      James Barros, seventy-six years old at the time of the March 11 meeting, worked as a part-time drywaller and plasterer.  He has lived intermittently on Nantucket since he was eight years old.  Barros, skeptical that the Nantucket police were committed to solving the African Meeting House crime, sought assurance that the police were dutifully investigating the matter by routinely contacting the police and also by inquiring as to the status of the investigation at board meetings.  As Barros stated:  "That building is part of me.  I'm an African.  I have a right to ask who is doing damage to my house."  
      Discussion.  1.  Constitutional guarantee of free speech on public issues.  It would be difficult to overstate the critical role that free speech on public issues has played in our nation's founding and in the preservation of our democratic ideals.  As Justice Brandeis articulated in his concurring opinion in Whitney v. California, 274 U.S. 357, 375—376 (1926),
"Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government.  They recognized the risks to which all human institutions are subject.  But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.  Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law —- the argument of force in its worst form.  Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." (Footnote omitted.)  
      Further, that the plaintiffs claim the defendants violated their rights to speak freely and participate in the public comment portion of a board meeting bears emphasis because our common law has long recognized that "the fullest and freest discussion seems to be sanctioned and encouraged by the admirable passage in the constitution" for "orderly and peaceable" public participation in town meetings (quotations and citation omitted).  Barron, 491 Mass. at 417.  In fact, civic participation in public discussion has been essential to the identity of the Commonwealth.  As the Supreme Judicial Court recognized in Barron: 
"It is hard to overestimate the historic significance and patriotic influence of the public meetings held in all the towns of Massachusetts before and during the Revolution.  No small part of the capacity for honest and efficient local government manifested by the people of this Commonwealth has been due to the training of citizens in the form of the town meeting.  The jealous care to preserve the means for exercising the right of assembling for discussion of public topics . . . demonstrates that a vital appreciation of the importance of the opportunity to exercise the right still survives."
      Id., quoting Commonwealth v. Porter, 1 Gray 476, 478, 480 (1854).  See Connick v. Myers, 461 U.S. 138, 145 (1983) ("the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values" [quotation and citation omitted]).  Because of the importance of open and free public discussion, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  Barron, supra at 422, quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).
      As our nation's history has demonstrated, the question is not whether government action will suppress speech protected by the First Amendment; it inevitably will.[10]  The questions are more precisely first whose speech will be suppressed and second by what means.  The courts, of course, play the critical role in safeguarding free speech from government encroachment.  See, e.g., Trop v. Dulles, 356 U.S. 86, 103 (1958) ("The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights").  In Massachusetts, any attempt to curtail political speech for its content -- as in the instant case -- must withstand strict scrutiny, "which means it must be both necessary to serve a compelling [S]tate interest and . . . narrowly drawn to achieve that end" (quotations and citation omitted).  Barron, supra at 420.
      2.  Abridgment of speech.  To determine whether the defendants violated the plaintiffs' right to free speech under art. 16, it is necessary to establish what degree of governmental action is forbidden.  The framers of both the First Amendment[11] and art. 16, as amended in 1948 by art. 77 of the Amendments to the Constitution, elected to use the word "abridge," and not for instance the word "prohibit," in order to protect an individual's right to speech free from government interference.  See First Amendment ("Congress shall make no law . . . abridging the freedom of speech"); art. 16 ("The right of free speech shall not be abridged").  Although the usage of the word abridge has declined since 1789, its definition has not changed:  to abridge means to diminish, curtail, limit, deprive, lessen in duration, or reduce in scope.[12]
      In defining the limits of government encroachment on free speech, the Supreme Court has interpreted abridgement to include government actions that discourage, inhibit, curtail, deter, impose a burden, or exert pressures on an individual from enjoying the freedom of expression, assembly, or association.[13]  See Meyer v. Grant, 486 U.S. 414, 428 (1988) ("The Colorado statute prohibiting the payment of petition circulators imposes a burden on political expression that the State has failed to justify" [emphasis added]); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66 (1963) ("the Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression" [emphasis added]); Lamont v. Postmaster Gen., 381 U.S. 301, 309 (1965) (Brennan, J., concurring) ("inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government" [emphasis added]); Shelton v. Tucker, 364 U.S. 479, 486 (1960) (statute requiring teacher applicants to disclose organization memberships unlawfully abridged freedom of association by placing "pressure upon a teacher to avoid any ties which might displease" [future employers] [emphasis added]); National Ass'n for the Advancement of Colored People v. Alabama ex rel. Patterson, 357 U.S. 449, 460–461 (1958) (Patterson) (State action which had the effect of "curtailing the freedom to associate" deemed unconstitutional [emphasis added]); American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 402 (1950) (Douds) ("Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes" [emphasis added]).  See also Laird v. Tatum, 408 U.S. 1, 11 (1972), and cases cited ("constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights").[14]
      For example, in Patterson, 357 U.S. at 462, the Supreme Court reviewed whether Alabama could lawfully compel the Alabama chapter of the National Association for the Advancement of Colored People (NAACP) to reveal to the State's Attorney General the names and addresses of all its members; the Attorney General sought a production order to comply with an Alabama statute regulating corporate filings.  The Supreme Court concluded the production order unlawfully abridged the NAACP members' freedom of association[15] because its consequences were likely to "induce members to withdraw from the [NAACP] and dissuade others from joining it because of fear of exposure of their beliefs."  Id. at 463.  See Lamont, 381 U.S. at 306-307 (statute unconstitutional as applied because it inhibited exercise of addressees' First Amendment rights by placing affirmative obligation on addressee to send reply card to post office in order to receive political informational materials in mail).
      Thus, a review of the plaintiffs' claims begins by acknowledging that the fact that defendants did not succeed in silencing the plaintiffs does not determine the free speech issue under arts. 16 and 19; instead, we look to the nature and degree of any discouragement, deterrence, or inhibition.[16]  See Douds, 339 U.S. at 399, 402.
      "In considering a motion for summary judgment, we view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party."  Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 474–475 (2013).  "[I]n cases raising First Amendment issues [the Supreme Court has] repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"  Bose Corp. v. Consumers Union of the U.S., Inc., 466 U.S. 485, 499 (1984), quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284–286 (1964).
      3.  Article 16 Claims.  a.  Samuels.  In addressing her local representatives at a board meeting on March 11, 2020, Samuels's speech was clearly protected by arts. 16 and 19.  In an orderly and peaceful manner, Samuels attempted to express her "serious concerns about the Nantucket Police Department's . . . failure to adequately investigate the 2018 hate crime at the African Meeting House, and the inappropriate response of the Town Manager, . . . Gibson."[17]  More specifically, Samuels sought to shine light on the police department's dismissive attitude toward Black residents.  She also sought to convey her concerns that Gibson and the police were covering up for the individuals who were suspected of committing the crime.  In response, Gibson repeatedly interrupted Samuels and in a threatening voice told Samuels, "No, you are not going to speak."[18]  Gibson also accused Samuels of speaking in a manner contrary to the board's comment policy.[19]  That Samuels was deterred from speaking freely was initially demonstrated by her immediate physical response, as she retreated from the speaker's microphone in response to Gibson's hostility, and returned to her seat in the audience.  Samuels's ability to speak freely was sufficiently inhibited at this point for her claim to survive summary judgment.  Gibson then stormed past Samuels in a threatening manner and left the meeting.  
      Gibson's words and departure signaled to Samuels, the board, Pittman, Barros, and the broader community that she, as a main representative of the town government, would not tolerate the content of Samuels's speech.[20]  A reasonable jury could conclude that Gibson's intent and the effect of her speech were to quash further discussion of the investigation into the African Meeting House crime, thus exceeding what might constitute protected speech involving the conveyance of her belief as to the merits of the investigation.  Cf. Vullo, 602 U.S. at 188 ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead").  Further, it can reasonably be inferred that Pittman sought to continue Gibson's effort to suppress Samuels's speech by accusing Samuels of conducting an improper inquisition in an improper forum.[21]  
      Viewing the evidence in the light most favorable to Samuels, a reasonable jury could conclude that the defendants' words and actions caused Samuels to be fearful and to feel threatened and intimidated, as she has alleged, and thus deterred Samuels from fully expressing her concerns about the police and Gibson.  See Lamont, 381 U.S. at 306-307 (government may not inhibit the exercise of First Amendment rights); Barron, 491 Mass. at 424 (defendant board member telling plaintiff to stop talking and yelling at her contributed to court's conclusion that plaintiff could plausibly establish violation of arts. 16 and 19 rights underlying MCRA claim).  Although Samuels approached the microphone again and continued speaking after Gibson left the meeting in protest, a reasonable jury could conclude that Samuels's role had been reduced to responding under duress to Gibson and Pittman instead of fully and freely expressing the grievances that she had intended to convey when she first stood at the microphone.  In this context, a jury could reasonably conclude that the content and import of Samuels's speech were diminished by the defendants' words and conduct.
      A reasonable jury could also conclude that Samuels's fear of and inhibition from speaking freely was based on the potential for retaliation or hostility from the defendants or the community due to the defendants' respective positions of authority and influence on the island.[22]  See Meyer, 486 U.S. at 421 ("The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment").  The inhibiting effect the defendants' conduct had on Samuels is further illustrated by the fact that she never again spoke at a board meeting after March 11 because of the hostile manner in which the defendants treated her on March 11.
      Moreover, to counter the defendants' burden at summary judgment, Samuels was not required to provide an accounting of specific content that she was unable to voice due to the defendants' conduct.[23]  As the nonmoving party, it is sufficient that Samuels declared her intent in attending the board meeting was to address specific grievances with the police department and Gibson, and that, viewing the evidence in the light most favorable to Samuels, she demonstrated that the defendants' interference diminished her ability to do so.  See Shelton, 364 U.S. at 486; Patterson, 357 U.S. at 460-461; Douds, 339 U.S. at 402.  See also Lawrence v. Cambridge, 422 Mass. 406, 410 (1996) (nonmoving party's burden is not to prove their case but rather to raise possibility that facts exist from which reasonable trier of fact could find in their favor).
      Reason and precedent compel this result.  The defendants' conduct is no less unconstitutional because Samuels, and then later Barros, had the courage and determination to continue to attempt to convey their viewpoints after being discouraged from doing so.  See Reproductive Rights Network, 45 Mass. App. Ct. at 500 ("That the [plaintiffs' protected speech and association] have taken place [despite defendant's attempt to prohibit] does not extinguish the question whether art. 16 or the MCRA were violated in that instance" by defendant's conduct).  See also Blake, 417 Mass. at 473 (defendants' blockade of abortion clinic doors amounted to "threats, intimidation, or coercion" violative of MCRA even though some patients persisted in accessing clinic's building).  Cf. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (defendants' liability for retaliatory free speech claim dependent on objective standard, not subjective inquiry dependent on "the plaintiff's will to fight").  Such a conclusion would lead to the absurd result that the more steadfast a person was in attempting to lawfully exercise their constitutional rights, the less protection they would receive.  Furthermore, a conclusion that an individual's persistence in exercising their free speech rights in the face of unconstitutional government encroachment extinguishes the viability of their art. 16 claim would be inconsistent with the Supreme Court's interpretation of government abridgment of free speech, as discussed supra at 9-10, and as viewed through an objective lens.
      Here, the summary judgment record demonstrates that a reasonable jury could conclude that Samuels, and a person of reasonable fortitude, would have been deterred from exercising their rights under arts. 16 and 19 in light of the persistent and hostile opposition from  Gibson and Pittman.
      b.  Barros.  The same conclusion holds for Barros's claims against Pittman.  The record could support a finding that Pittman, aware that Barros, a persistent and vocal critic of the police department, was present at the March 11 board meeting, sought to preemptively silence Barros by mocking his past participation in board meetings, misstating the truth concerning the hate crime investigation, pointing at and publicly accusing Barros of being the individual who was spreading the rumors that divided the town, and alleging that Barros failed to cooperate with the authorities, all while armed and displaying a police badge on his vest.[24]  
      The record supports a rational jury concluding that Pittman's words and conduct threatened Barros to the extent that Barros was terrified when he stood at the town meeting to respond.[25]  Barros' fear was based in part on his experience as a Black man who was distrustful and a vocal critic of the Nantucket police.  As a consequence of Barros's continued pressure on the police to meaningfully pursue the hate crime investigation, the lead town investigator, Detective Klinger, responded with hostility toward Barros.  In addition, numerous people advised Barros "to watch [his] back," and warned him that the Nantucket police were going to "set him up."  A reasonable jury could conclude that Pittman's words and conduct, on the heels of Gibson's statements and her abrupt departure from the meeting in protest, chilled Barros from speaking freely about his concerns that the police and Gibson were not interested in investigating the hate crime and caused him reasonably to fear retaliation.  That Pittman's admonishments toward Barros did not include a direct threat to silence or punish him does not relieve Pittman of liability, as the evidence supports that the implicit nature of Pittman's coercive conduct toward Barros sufficiently inhibited his speech.  Cf. Bantam Books, Inc., 372 U.S. at 66 ("It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments").  
      The record demonstrates that Barros's fear of the Nantucket police was well grounded.  Barros, while driving, was pulled over by the police on two separate occasions following the March 11 board meeting.  One Sunday morning, a Nantucket officer pulled Barros over as Barros was headed home from Mass celebrated at St. Mary's Church.   The officer approached Barros's truck with his hand on his gun.  Although the officer stated that he stopped Barros due to a brake light malfunction, the record indicates Barros's lights were functioning properly and allows the inference of a retaliatory stop.  See Patterson, 357 U.S. at 462 (plaintiffs demonstrated "likelihood of a substantial restraint" on their First Amendment right to associate by showing that defendants' actions exposed them to "manifestations of public hostility").[26]
      Furthermore, by portraying Barros as a malcontent who was spreading rumors, Pittman placed an improper affirmative burden on Barros that compelled him to defend himself and clear his name before he could freely exercise his rights under arts. 16 and 19.  Cf. Lamont, 381 U.S. at 307 (government may not create "affirmative obligation" which inhibits plaintiffs from exercising First Amendment rights).
      In concluding that the plaintiffs have no reasonable expectation of establishing the inhibition of their art. 16 rights, the majority cites three cases as authority:  Barron, 491 Mass. at 423; Walker v. Georgetown Hous. Auth., 424 Mass. 671, 676 (1997); Reproductive Rights Network, 45 Mass. App. Ct. at 506-507.  See ante at        .  These cases are distinguishable from the circumstances before us.  In each case, the reviewing court addressed a government action that amounted to total prohibition on the expression of protected speech under art. 16.  See Barron, supra (public meeting "civility code" prohibited protected political speech); Walker, supra (public housing authority's policy prohibited receipt of communications guaranteed by First Amendment and art. 16); Reproductive Rights Network, supra at 505 (university violated plaintiffs' free speech and association rights by locking building and posting uniformed officers where plaintiffs planned to meet).  None of those cases either purported to define the degree of government encroachment necessary to satisfy an abridgment claim or decided that an aggrieved party's resistance to the government encroachment precluded such a claim.  Compare Reproductive Rights Network, supra at 500.  To conclude that these cases set a minimum standard for government conduct violative of free speech by requiring the prohibition of speech, and not mere interference, would contradict Supreme Court jurisprudence cited supra at 9-10.  Accordingly, these cases do not specifically address, never mind control, the issues before us today.
      Further, in concluding the plaintiffs' art. 16 claims fail to allege the plaintiffs' rights were abridged, the majority asserts that the defendants' "expressions of disapproval," ante at        , directed at the plaintiffs must be viewed as an accepted consequence of our country's proud history of "uninhibited robust" debate, Barron, supra at 421.  I agree that New York Times Co. and its progeny guarantee uninhibited and robust debate on public issues by protecting an individual's right to criticize public officials in the performance of their duties, even if the criticism is accusatory, mean spirited, and personal.  See New York Times Co., 376 U.S. at 270 ("debate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" [emphasis added]).  See also Barron, 491 Mass. at 423 (town resident accusing board member of acting like "Hitler" in relation to official's duties constituted protected political speech under art. 16); Van Liew v. Stansfield, 474 Mass. 31, 38-39 (2016) (accusations by private citizen that select board member was "corrupt and a liar" and "wrong, uneducated or stupid" were protected political speech).
      The majority's reliance on this body of law is misplaced, however, because these cases do not purport to extend the same free speech protections to government actors who use caustic speech against an individual attempting to exercise their free speech rights.  While public officials do not forfeit their rights under art. 16 and the First Amendment, this line of cases does not apply to public officials who direct speech, that would reasonably be perceived as inhibiting, at private individuals who seek to exercise their right to speak freely on public issues.  Here, a rational jury could conclude the defendants spoke not merely "expressions of disapproval," as tolerated in a robust debate, but instead, that the defendants' speech restricted the expression of a critical viewpoint on a public issue in violation of arts. 16 and 19.[27]  Cf. Vullo, 602 U.S. at 188.  
      Because the defendants attempted to restrict the plaintiffs' political speech based on its content, any justification for their conduct must be "both 'necessary to serve a compelling [S]tate interest and . . . narrowly drawn to achieve that end."  Barron, 491 Mass. at 421, quoting Commonwealth v. Lucas, 472 Mass. 387, 398 (2015).  The record does not demonstrate that the defendants' actions were narrowly drawn and necessary to serve a State interest.[28]  Their conduct does not withstand strict scrutiny.
      Therefore, considering the record in the light most favorable to the plaintiffs, the defendants did not satisfy their burden of showing that the plaintiffs have no reasonable expectation of proving an essential element of either their art. 16 or MCRA claims.  Whether the plaintiffs were sufficiently deterred in their exercise of rights secured by arts. 16 and 19 because they were intimidated, frightened, and threatened by the defendants' actions raises questions for a finder of fact, and should not have been resolved on summary judgment.  See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991) (in cases where "[m]uch depends on the credibility of the witnesses testifying as to their own states of mind . . . the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses" [citation omitted]).  See also Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984) ("Frequently, the pleadings, affidavits, and other submitted materials render necessary a further exploration of the significant facts and a decision on these 'state of mind' issues by a trier of fact who has heard and evaluated all relevant evidence").
      Finally, summary judgment should not have entered against the plaintiffs on count I of the third amended complaint, in which they sought a declaratory judgment that the defendants must, in sum, refrain from regulating speech based on its content in future meetings unless such regulation adheres to principles of strict scrutiny.  The record supports the reasonable conclusion that the defendants, during a public and recorded hearing, demonstrated that they had no hesitation to attempt to suppress speech if its content proved unfavorable to them and that they would likely do so again in the future.  See Reproductive Rights Network, 45 Mass. App. Ct. at 500.  See also Commonwealth v. Adams, 416 Mass. 558, 563–564, 566 (1993) (proper to enjoin future police misconduct so that the unrepentant defendants would not feel "free to continue" their "unlawful conduct" in failing "to protect a citizen from the denial of his civil rights").
      4.  Barros's MCRA Claim.  "The [MCRA] was enacted in response to problems of racial violence and harassment."  O'Connell v. Chasdi, 400 Mass. 686, 692 (1987).  "The Legislature enacted the statute to provide a remedy for victims of racial harassment and to redress the derogation of secured rights [that] occurs by threats, intimidation or coercion" (quotations and citations omitted).  Buster v. George W. Moore, Inc., 438 Mass. 635, 645–46 (2003). By prohibiting attempts to interfere with an individual's rights, the MCRA protects individuals subjected to interference through coercion or intimidation, but who persist in exercising their rights.  See, e.g., Blake, 417 Mass. at 471 (affirming MCRA claim for plaintiffs even though some plaintiffs not deprived of access to abortion services).  Considering the evidence in the light most favorable to Barros, Pittman has not established that no reasonable jury could conclude that he attempted to interfere with Barros's arts. 16 and 19 rights through the intimidating and coercive statements and actions detailed above.[29]  See Kennie v. Natural Resources Dep't of Dennis, 451 Mass. 754, 759 (2008).
      Conclusion.  Nearly one hundred and eighty years after Frederick Douglass sought refuge in Massachusetts and traveled to Nantucket to make his first public speech condemning slavery, a person desecrated a site sacred to the island's Black community with the words "Nigger leave."[30]  The act was more than an act of property vandalism, as it communicated a direct threat to the plaintiffs' safety and well-being as Black residents of Nantucket.  While the United States Constitution, Massachusetts Declaration of Rights, and our laws will never eradicate the hatred and racism in the hearts of individuals who commit such acts, our legal framework guarantees people the right to speak out against such offenses, to petition local officials for answers, and to criticize local government and police officials for failing in their oaths to support our laws and Constitution and to seek justice for all.  Of course, it would be folly to take the force and endurance of these constitutional rights for granted, perhaps lulled by the longstanding welfare and security of our nation and by our courts' historical commitment to safeguarding free speech rights as fundamental to our representative democracy.  We do not have that luxury because, even considering the relative strength of our democracy, these rights are subject to the whim of unchecked power that allows for tyrannical tendencies to suppress contrary viewpoints.  See, e.g., Whitney, 274 U.S. at 376 (Brandeis, J., concurring).  Thus, the judiciary's vigilance to protect from government interference our people's right to speak to public issues is as critical today as it was when the First Amendment was ratified in 1791.  See Bantam Books, Inc., 372 U.S. at 66 ("the freedoms of expression must be ringed about with adequate bulwarks").   
      The plaintiffs in this case enjoyed a reasonable expectation that a jury could conclude that the defendants abridged their rights to speak freely on a public issue in violation of arts. 16 and 19, and the MRCA.  In affirming all but one count of the judgment, this court "departs from its own best role as the guardian of individual liberty in the face of governmental overreaching."  Kleindienst v. Mandel, 408 U.S. 753, 784–85 (1972) (Marshall, J., dissenting).  
      Respectfully, I dissent.
 
 
Appendix.
footnotes for dissenting
 
          [1] Rose Marie Samuels.
      
          [2] Elizabeth Gibson, individually and as town manager of Nantucket, and William Pittman, individually and as chief of police of Nantucket.  Two other defendants named in the third amended complaint, Dylan Ponce, and John Doe, a second unknown perpetrator of the underlying African Meeting House hate crime, are not a part of this appeal.
          [3] The third amended complaint also raised a facial challenge to the board's agenda protocol, see Barron v. Kolenda, 491 Mass. 408, 409-410 (2023), but the issue was neither reached in the trial court nor argued here, so we do not address it.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).
          [4] "We use the epithet in full once for clarity, and to ensure that the topic is searchable in legal databases."  Commonwealth v. Rodriguez, 101 Mass. App. Ct. 439, 440 n.3 (2022).  
      
          [5] In this action, a separate and final judgment entered against Ponce for violating the plaintiffs' civil rights; that judgment is not at issue in this appeal, and Ponce and Doe are no longer parties.  See note 2, supra.
          [6] All references to "Gibson" in this opinion are to the defendant Elizabeth Gibson, the town manager, unless otherwise noted.  
      
          [7] Pittman also attended the meeting.  He sat in the audience.
          [8] At the time, the board meetings followed Robert's Rules of Order, under which all questions and comments were to be addressed solely to the chair.  Under the board's agenda protocol, the public comment period was "for bringing matters of public interest to the attention of the board" and was "not to be used to present charges or complaints against any specifically named individual, public or private; instead, all such charges or complaints should be presented in writing to the Town Administrator who can then give notice and an opportunity to be heard to the named individual as per" G. L. c. 39, § 23B.  A revised version of the agenda protocol became effective sometime after this action was filed.
      
          [9] On appeal, Samuels focused on Gibson's behavior and not the actions of the board chair.  The motion judge did not address the constitutionality of the agenda protocol pursuant to which the chair ran the meeting.  Because the plaintiffs challenge behavior by two town employees who were not members of the board and who, at least as far as is revealed by our record, neither had nor are alleged to have had any authority or responsibility to enforce that protocol, our review of the summary judgment decision does not include consideration of the constitutionality of the agenda protocol. 
      
          [10] This was likely a reference to the Federal "Varsity Blues" investigation.  See, e.g., United States v. McGlashan, 78 F.4th 1, 3 (1st Cir. 2023).
          [11] Speakers at select board meetings, town meetings, and other governmental forums, including public figures, may or may not offer thoughtful and productive criticism and may be civil or uncivil.  Without endorsing it, we acknowledge that public meetings often include rude and personal commentary over issues great and trivial.  Government officials must expect criticism -- even harsh, unfair, or discourteous criticism -- and might be best served by listening stoically.
          [12] The plaintiffs' MCRA claims were brought against the "Town Defendants," a term not defined in the third amended complaint but that we understand as encompassing the board, Gibson, and Pittman.  We are skeptical that the board is a proper defendant for such a claim, see Howcroft v. Peabody, 51 Mass. App. Ct. 573, 591-592 (2001) ("persons" covered by MCRA are "corporations, societies, associations and partnerships" [citation omitted]; no indication term includes political subdivisions), but need not resolve the issue because we understand Barros's claims to be focused on Pittman and Samuels's to be focused on Gibson, neither of whom was a member of the board. 
          [13] Some of Gibson's comments may be understood as an attempt to encourage the chair to enforce the agenda protocol.  If a "trier of fact concludes that the [defendant's] words could reasonably be understood only to impress an intention to use lawful means" to block the plaintiff's action, "those words would not be a threat, intimidation, or coercion actionable under" the MCRA.  Pheasant Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 781-782 (1987).  We do not opine whether this is a viable defense in this case and only note the added dimension in the assessment of Samuels's MCRA claim.  In addition, on remand, Gibson may raise government officials' free speech rights, including the right to defend themselves, even angrily or noisily, when accused of wrongdoing.  "A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead. . . .  What she cannot do, however, is use the power of the State to punish or suppress disfavored expression."  National Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 188 (2024).  
      
          [14] We do not understand Barros's MCRA claim to relate to the chair's interruption reminding him that the investigation had been turned over to the State police.  If it does, we conclude that this interruption cannot support a claim under the MCRA.  Compare, e.g., Barron, 491 Mass. at 423 (silencing plaintiff by ending public comment section and declaring a recess of meeting); Planned Parenthood, 417 Mass. at 473 (blocking access to abortion clinics); Batchelder, 393 Mass. at 823 (silencing plaintiff by ordering him to stop soliciting and distributing political handbills at shopping center).
          
 
 
 
Appendix.
 
 
[1] See
      
          [2] See, e.g., C.W. Mills, The Power Elite (1956).  Mills coined the term "power elite" to describe, generally, influential individuals within our society who have overlapping interests and "whose positions enable them to transcend the ordinary environments of ordinary men and women; they are in positions to make decisions having major consequences."  Id. at 3-4.  While Mills described this phenomenon occurring on a macro, even global scale, the record at summary judgment leads to the reasonable inference that the defendants were part of small group of individuals on Nantucket who held significant power and influence on town affairs.
          [3] As relevant here, art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Constitution, provides, "The right of free speech shall not be abridged."  The plaintiffs' public or political speech is also protected under art. 19, which provides, "The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer."  See Barron v. Kolenda, 491 Mass. 408, 415 (2023).  See also ante at        .
          [4] I agree with the court's decision to (1) vacate the judgment as it pertains to Samuels's MRCA claim, and (2) affirm the grant of summary judgment on Barros's art. 16 and MCRA claims as they pertain to Gibson.
      
      [5] Context matters, as discussed further below, in assessing whether an individual's arts. 16 and 19 rights, and rights under the MCRA, were inhibited.  See Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474–475 (1994) ("In the context of this case, the judge correctly applied the objective standard of whether a reasonable woman seeking abortion services would be threatened, intimidated, or coerced by the defendants' conduct").
 
          [6] Gibson's husband had been the deputy chief of police since about 2000.
      [7] At a board meeting on June 19, 2019, Pittman announced that the Nantucket police department had turned the investigation over to the State police. 
 
          [8] On June 17, 2019, Gibson's brother-in-law Jeffrey Sayle told the police that Dylan Ponce had confided [to Sayle] to "hit[ting] the nigger church."  Sayle kept the spray paint can that Ponce admitted using to "hit" the African Meeting House until the State police took over the investigation and recovered it from Sayle in July 2020.
      
          [9] See, e.g., I. Wilkerson, Caste:  The Origins of Our Discontents (2020), for a historian's description of the hierarchical castes, based on artificial lines drawn from often immutable characteristics such as race, that she posits have endured in American communities.
          [10] Numerous examples of governmental interference with free speech rights are set forth infra at        .  See also Texas v. Johnson, 491 U.S. 397 (1989); United States v. O'Brien, 391 U.S. 367 (1968); West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943); Thornhill v. Alabama, 310 U.S. 88 (1940); Stromberg v. Cal., 283 U.S. 359 (1931).  See generally R.A. Smolla, Smolla and Nimmer on Freedom of Speech §§ 3:1, 9 (2025), and cases cited, where the government engaged in viewpoint discrimination.
      
          [11] "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Massachusetts Coalition for the Homeless v. Fall River, 486 Mass. 437, 440 (2020), quoting Reed v. Gilbert, 576 U.S. 155, 163 (2015).
      
          [12] This definition of abridge is consistent with both historical and modern understandings.  See, e.g., National Endowment for the Arts v. Finley, 524 U.S. 569, 595 (1998) (Scalia, J., concurring), quoting T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("To abridge is 'to contract, to diminish; to deprive of'"); Black's Law Dictionary 8 (12th ed. 2024) ("To reduce or diminish [abridge one's civil liberties]"); American Heritage Dictionary of the English Language (5th ed. 2016) (To limit; curtail); Webster's 3d New International Dictionary 6 (2002) ("To diminish [as a right] by reducing").
      
          [13] Although the plaintiffs bring their claim under art. 16, "the protection provided by the State Constitution is at least as great if not greater than the protection provided by the First Amendment for content-based governmental restrictions."  Barron, 491 Mass. at 420 n.12.  See Roman v. Trustees of Tufts College, 461 Mass. 707, 713 (2012) ("we have rejected the assertion that art. 16 can 'extend no further than the comparable provisions of the First Amendment'" [citation omitted]). 
          [14] While these cases addressed whether a type of prior restraint -- for example, a regulation, statute, or court order -- restricted First Amendment rights, "the prohibition of laws abridging the freedom of speech is not confined to previous restraints."  Schenck v. United States, 249 U.S. 47, 51 (1919). See Hosford v. School Comm. of Sandwich, 421 Mass. 708, 713 (1996) ("attempt by government officers to punish a person for what that person has said. . .  squarely implicates the First Amendment"); Reproductive Rights Network v. President of the Univ. of Mass., 45 Mass. App. Ct. 495, 496 (1998) (university officials' actions interfered with plaintiffs' free speech rights). 
      
          [15] Although the challenge in Patterson was to the freedom to associate, "this Court has more than once recognized . . . the close nexus between the freedoms of speech and assembly."  357 U.S. at 460.  "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech [under the First Amendment]."  Id.
      
          [16] In reviewing free speech claims, courts have applied an objective standard to the nature of the government conduct at issue.  See, e.g., Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997), cert. denied, 523 U.S. 1023 (1998), citing Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 800 (1985) ("when a plaintiff seeks to launch a First Amendment challenge addressed to a policy or practice that restricts expressive activity on public property, he must plead facts sufficient to show [1] that the government has burdened a protected form of speech, and [2] that the restriction is unreasonable").  Cf. Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) ("the pertinent question in a [42 U.S.C.] § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter 'a reasonably hardy individual[]' from exercising his constitutional rights" [emphasis added; citation omitted]).
          [17] Samuels sought to exercise her free speech rights at the established time and place -- public comment at select board meetings -- and to the appropriate public official, as Gibson, the town manager, was the supervisor to the police and liaison to the board.
      
      [18] Gibson, when deposed, admitted that she had no authority to command Samuels to stop speaking.  Furthermore, the record appendix, which contains recordings of portions of numerous board meeting, indicates that Gibson never attempted to exert such authority, or silence any speaker other than Samuels, at any other meeting.   
 
      [19] The plaintiffs alleged in their third amended complaint that the board's public comment policy in place at the time of the March 11, 2020 meeting amounted to an unconstitutional prior restraint because it required that "all charges or complaints should be presented in writing to the Town Administrator" instead of expressed at the public comment portion of the board meeting.  The board adopted a new policy after the plaintiffs filed their complaint in the instant case.  The new policy no longer contains this prior restraint language.  In light of the revisions to the board's policy, the plaintiffs' conceded that their facial challenge to the board's prior policy or agenda protocol in effect during the March 11 meeting was moot.  Although the legality of the board's prior policy is not before us on appeal, that Gibson, absent real authority, accused Samuels of violating the policy could be deemed relevant by a reasonable jury as to whether Gibson attempted to inhibit Samuels's speech.
 
          [20] While the evidence supports the inference that the defendants were motivated to silence the plaintiffs in an attempt to protect the identity of Gibson's family members suspected of being involved in the crime, the plaintiffs are not required to establish that the defendants acted intentionally to abridge the plaintiffs' speech under art. 16.  See Patterson, 357 U.S. at 461 ("abridgement of such rights [speech, press, or association], even though unintended, may inevitably follow from varied forms of governmental action").
          [21] The record demonstrates that Gibson and Pittman enjoyed a close professional relationship.  Evidence of the defendants' shared purpose or intent as manifested at the March 11 meeting is relevant to an assessment whether they attempted to suppress the plaintiffs' speech.  For instance, Pittman, after he spoke at the March 11 meeting, departed from the meeting room while Barros was still speaking.  Pittman then huddled with Gibson in a conference room in the town hall complex.  When deposed as to what they spoke about during this encounter, both Pittman and Gibson testified that they had no memory of what they discussed.  
          [22] The record supports the reasonable inference that Samuels's and Barros's interest in the African Meeting House crime provoked public ire against them.  After the March 11 meeting, town employee Ericka Mooney, who was under the supervision of Gibson, sent a text message to Gibson that stated, "I'm so sorry.  If this will make you feel any better, RM [Samuels] is getting vilified on [Facebook]."  Gibson responded, "Good."  See Patterson, 357 U.S. at 462 (that defendant's actions exposed plaintiffs to "manifestations of public hostility" could be violative of plaintiffs' First Amendment right).
      
          [23] Although it is not required for a plaintiff to make a showing of specific content that was omitted due to government encroachment, it is reasonably inferable from the record that Samuels makes this showing.  For instance, after Gibson left the meeting, Samuels said she had three questions for Pittman, but she then only asked two questions.  This omission could be reasonably interpreted as demonstrating that Samuels was so frightened and disturbed to that she became unable to fully express her concerns.
          [24] Pittman's statement that "nobody can tell us who did it" is contrary to the record.  At the time of this meeting, Pittman was well aware that that Sayle, Gibson's brother-in-law, had told the Nantucket police that Dylan Ponce had confessed to committing the crime.  Pittman's attempt to assign the blame for the rumors on Barros is also contrary to the materials submitted on summary judgment. In the light most favorable to Barros, the record demonstrates that the identities of the suspects was common knowledge among town residents.  In fact, District Attorney Michael O'Keefe, after convening a grand jury sometime in 2020 to investigate the African Meeting House vandalism, stated to a reporter:  "The people in Nantucket know exactly what happened here. . . .  So when those people decide to tell the truth, then the case will be resolved."  See Dugan Arnett, On Nantucket, a Racist Act Gets a Second Look, Boston Globe, August 22, 2020.  While Pittman had no obligation to share information at the board meeting due to his department's investigation, maintaining confidentiality did not require him to misstate the truth and mislead the public.
      
      [25] During his deposition, Barros testified that he stopped attending board meetings because he was "terrified on March 11th what happened [to him]."
      [26] Barros also learned that he and Samuels were the subjects of a demeaning Facebook post in which Gibson participated.  Considering the defendants' prominent position in this small community, a reasonable jury could conclude that Pittman was aware that his conduct at the March 11, 2020 board meeting would likely bring public disapprobation aimed at Barros.
      [27] This court has constitutional authority to find the defendants' conduct violative of arts. 16 and 19 even if, assuming arguendo, the defendants' conduct was permissible under the Supreme Court's First Amendment jurisprudence.  See Roman, 461 Mass. at 713 ("we have rejected the assertion that art. 16 can 'extend no further than the comparable provisions of the First Amendment'" [citation omitted]).  It should do so here.
 
          [28] On appeal, the defendants have not offered any compelling government interest that justified their interference with the plaintiffs' rights.
      
          [29] For the purposes of the MCRA, "'[i]ntimidation' involves putting in fear for the purpose of compelling or deterring conduct."  Blake, 417 Mass. at 474.  "Coercion" is defined as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.  Deas v. Dempsey, 403 Mass. 468, 471 (1988), quoting Webster's New International Dictionary 519 (2d ed. 1959).
      
          [30] In August 1841, Douglass joined a delegation of the Massachusetts Anti-Slavery Society to attend what he later described as a "grand convention" on Nantucket.  See D.W. Blight, Frederick Douglass:  Prophet of Freedom c. 6